RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0290p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RITA MORRISSEY, an individual,

*Plaintiff-Appellant*,

*v.*

No. 18-1704

LAUREL HEALTH CARE COMPANY, a Foreign Profit Corporation; OAK HEALTH CARE INVESTORS OF COLDWATER, INC., a Domestic profit corporation,

*Defendants-Appellees*.

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cv-00089—Janet T. Neff, District Judge.

Argued: March 12, 2019

Decided and Filed: December 3, 2019

Before: DONALD and STRANCH, Circuit Judges[*]

---

## COUNSEL

**ARGUED:** Sarah S. Prescott, SALVATORE PRESCOTT & PORTER, PLLC, Northville, Michigan, for Appellant. Christina A. Ginter, KITCH DRUTCHAS WAGNER VALITUTTI & SHERBROOK, Detroit, Michigan, for Appellees. **ON BRIEF:** Sarah S. Prescott, SALVATORE PRESCOTT & PORTER, PLLC, Northville, Michigan, for Appellant. Christina A. Ginter, Karen B. Berkery, KITCH DRUTCHAS WAGNER VALITUTTI & SHERBROOK, Detroit, Michigan, for Appellees.

---

[*]The Honorable Damon J. Keith, a member of the original panel, passed away on April 28, 2019. Judge Stranch and Judge Donald acted as a quorum pursuant to 28 U.S.C. § 46(d).

———————————

**OPINION**

———————————

BERNICE BOUIE DONALD, Circuit Judge.  Rita Morrissey is a licensed practical nurse who worked for The Laurels of Coldwater ("Coldwater"), a skilled nursing and rehabilitation center, from 2001 until she quit in 2016.  Morrisey alleges that she was under a twelve-hour work restriction due to a disability from 2012 onward, and Coldwater forced her to work beyond that restriction, compelling her to quit.

She sued Coldwater under the Americans with Disabilities Act for discrimination, failure to accommodate, and retaliation.  At summary judgment, Morrissey supported her claims with evidence that: (1) she was disabled, (2) Coldwater had a blanket policy of denying all requests for accommodation that were not work-related, (3) Coldwater forced Morrissey to work beyond her medical restrictions, and (4) Coldwater targeted Morrissey after she complained.  The district court granted summary judgment to Coldwater on all of Morrissey's claims.  Because there are numerous material factual issues in dispute, we **REVERSE and REMAND** for trial.

**I.**

The pertinent facts underlying Morrissey's claims begin in 2012, when she informed Coldwater that, due to physically disabling issues with her back, she could not work more than twelve-hours per shift.  In support, she submitted a note from her primary care physician, Doctor Terry Shipe.[1]  Morrissey's file also contained two notes written by nurse practitioner, V. Jean Bradley.  The first is dated February 9, 2012, and it, too, states that Morrissey could not work for more than twelve hours.  The next note, dated February 23, 2012, provides the same restriction, but it also states Morrissey is only restricted until her next office visit.  The record contains no further notes from Bradley.  Morrissey's position is that the absence of another note means that she remained under a twelve-hour work restriction.  Coldwater believes it means the opposite.  Thus, this fact is in dispute.

---

[1]The note was undated, but Morrissey avers it was written in January 2012.

In a February 2012 meeting, Coldwater management informed staff that Coldwater would not provide accommodations for any medical condition unless the condition stemmed from a work-related injury.[2]  Morrissey asserts that management went so far as to tell the staff that they must have any current restrictions lifted and that their jobs depended on it.  Morrissey even submitted a transcript of surreptitiously-recorded audio of the meeting and the affidavits of three former Coldwater employees who corroborated this claim.  Coldwater, relying on the depositions of Regional Director Jeff Shepard and Administrator Erin Tuttle, denies there was such a policy in place.  That denial is belied by emails between Tuttle and ADA Coordinator Hal Nottingham, in which they both state that it was Coldwater's policy to honor only those work restrictions that were based on work-related injuries.  Thus, at best, it is a disputed fact whether Coldwater had a blanket policy of denying all requested accommodations that were not based on a work-related injury.

In July 2015, Morrissey took leave under the Family Medical Leave Act so that she could undergo carpal tunnel surgery.  When Morrissey was ready to return to work, she alleges that she was informed by Coldwater management that they did not allow staff to work with medical restrictions.  Morrissey informed management that she did not have a restriction due to the surgery performed on her hands, but she reiterated that she still had a twelve-hour restriction due to her back.  Morrissey testified that management told her that they were not sure whether they would honor her previous accommodation.  On August 15, 2015, Morrissey submitted a note from her hand surgeon that stated that she "did not have any medical restrictions," and she returned to work in late September This is the final medical note in Morrissey's personnel file.  Therefore, it is a disputed fact whether Morrisey was still under a twelve-hour work restriction.

Around this time, Coldwater was considering whether it should transition its nurses to twelve-hour shifts.  Morrissey was aware of the possible change and testified that she spoke with Director of Nursing Jeanine Hayes about it.  Morrissey purportedly asked whether she could be transferred to a unit that was not going to be converted to twelve-hour shifts, or whether Morrissey could go to "casual status," which would have allowed her to avoid being mandated to work longer than twelve hours.  According to Morrisey, Hayes said that Morrissey could not transfer and that

---

[2]Morrissey stated that the leaders of the meeting were Director of Nursing ("DON") Andrea Mangold and ADA Coordinator Hal Nottingham.

Morrissey would not have wanted to go to casual status because Coldwater was phasing out its casual-status nurses, and casual status nurses did not receive guaranteed hours. Morrissey asserts that this constitutes a denial of a requested accommodation.

In December 2015, Coldwater transitioned two of its three nursing units, including Morrissey's, to twelve-hour shifts.[3] Morrissey was concerned about this transition because Coldwater would mandate its nurses to work more than twelve-hours when the next shift was not fully staffed. Before a nurse was mandated to stay for more than twelve-hours, Coldwater management would call around to see if they could get the shift covered voluntarily. If they could not, a nurse that was currently working that shift had to stay. To determine which nurse's turn it was to be mandated, Coldwater followed an unwritten procedure. Management maintained a list that kept track of which nurse had been mandated most recently. That nurse was moved to the back of the list and so forth. In the case of a tie, the selection was alphabetical.

According to Morrissey's time records, from July 2012 through January 30, 2016, she worked more than twelve hours on eight occasions, but there is no evidence that she was mandated to do so in any of those instances. Indeed, she clocked out within fifteen minutes of her twelve-hour shift ending each time.

Things indisputably changed on January 31, 2016, however, when Morrissey was mandated by Coldwater to stay and work a 13.5-hour shift. Morrissey testified that, upon learning that she would have to work more than twelve hours, she told her manager that she had a twelve-hour work restriction that had to be honored under the ADA, but the manager responded that she was unaware of Morrissey's restriction and that the manager had "no control" over the situation. The next day, Morrissey averred that she spoke with the Michigan EEOC and left a message with a Coldwater corporate officer. A Coldwater operations manager called Morrissey back and left a voice message, but Morrissey did not call him back.

---

[3]There are factual disputes as to exactly how this transpired. Morrissey argues that two of Coldwater's three nursing units fully transitioned to twelve-hour shifts, but Hayes testified that each unit retained at least some nurses who worked eight hour shifts. Both Morrissey and Hayes agree that Morrissey had the seniority to obtain a position working eight hours. However, Morrissey testified that Hayes flatly denied her request to work in a wing with eight-hour shifts, while Hayes testified that Morrissey voluntarily chose to work twelve-hour shifts.

Five days later, the situation deteriorated further.  During Morrissey's February 4, 2016 shift, she was informed that she was going to be mandated to work sixteen hours because a replacement nurse had called off from work.  Morrissey testified that it was not her turn to be mandated; in fact, it was Nurse Marci Farmer's turn.  Farmer corroborated that it was her turn to be mandated in her affidavit.  In the middle of the shift, Morrissey went to speak with Hayes about being mandated, but Hayes, purportedly, told Morrissey that there was nothing Hayes could do.  Morrissey left prior to her shift ending and never returned to Coldwater.

At summary judgment, the district court ruled in favor of Coldwater, finding that Morrissey had not established that she was disabled, that she had not suffered an adverse employment action, that Coldwater had not failed to accommodate her, and that Coldwater did not retaliate against her.  We disagree on each point.

**II.**

We review a district court's grant of summary judgment de novo.  *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 431 (6th Cir. 2006).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  All evidence must be viewed in the light most favorable to the nonmovant.  *Bormuth v. Cty. of Jackson*, 870 F.3d 494, 503 (2017).

We first address Morrissey's claim for disability discrimination, which includes an analysis of her claim for failure to accommodate.  We conclude by analyzing her retaliation claim.

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on "direct" or "indirect" evidence of discrimination.  *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891-92 (6th Cir. 2016).  This court has explained the logic behind this distinction as follows:

> When an "employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision[,] the *McDonnell Douglas* burden shifting

approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant[] and the plaintiff has direct evidence of discrimination on the basis of his or her disability."

*Id.* at 892 (alterations omitted) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996)).[4] Direct evidence of disability discrimination "'does not require the fact finder to draw any inferences'" to conclude "that the disability was at least a motivating factor." *Hostettler v. College of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013)).

Because "not making reasonable accommodations" is listed in the ADA's definition of disability discrimination, *see* 42 U.S.C. § 12112(b)(5)(A), "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).[5]

Under the direct framework, Morrisey bears the burden of establishing (1) that she is disabled, and (2) that she is "otherwise qualified for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kleiber*, 485 F.3d at 869 (citation and internal quotation marks omitted). Once the plaintiff has established these elements, the employer "bear[s] the burden of proving that . . . a proposed accommodation will impose an undue hardship upon the employer." *Monette*, 90 F.3d at 1186.

The indirect method applies the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting framework. *Monette*, 90 F.3d at 1179-85. Under this framework, once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate "a legitimate, nondiscriminatory rationale as a shield against *indirect* or *circumstantial* evidence of

---

[4]*Monette* was subsequently abrogated in part by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315-17 (6th Cir. 2012) (en banc), which held that a plaintiff must show that he or she suffered an adverse employment action "because of" rather than "solely by reason of" disability.

[5]*See also Brumley v. UPS*, 909 F.3d 834, 839 (6th Cir. 2018); *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018); *Hostettler*, 895 F.3d at 853.

discrimination." *EEOC v. Dolgencorp*, *LLC*, 899 F.3d 428, 435 (6th Cir. 2018). If the defendant can do so, "the burden then shifts back to the plaintiff, who 'must introduce evidence showing that the proffered explanation is pretextual.'" *Ferrari* 826 F.3d at 892 (quoting *Monette*, 90 F.3d at 1186).

Morrissey alleged: 1) a failure to accommodate and constructive discharge claim, under the direct method and 2) a retaliation claim, under the indirect method. However, the district court did not distinguish between these claims, instead stating only the framework for analyzing claims brought under the indirect method. The district court granted summary judgment on Morrissey's claims for disability discrimination on the basis that (1) she was not disabled, and (2) she did not suffer an adverse employment action. Before addressing those elements, we note that the district court erred in requiring Morrisey to prove she suffered an adverse employment action to pursue a claim for failure to accommodate. Under the direct evidence test, plaintiffs need not prove that they suffered an adverse employment action separate from the failure of the employer to reasonably accommodate the employee. *See Kleiber*, 485 F.3d at 868-69 ("failing to make a reasonable accommodation falls with the ADA's definition of 'discrimination,'" meaning "an employer's failure to offer a reasonable accommodation necessarily" involves an adverse action); *see also Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016) ("An employer is also liable for committing an adverse employment action if the employee in need of assistance actually requested but was denied a reasonable accommodation.").

## A.     Failure to Accommodate

Analyzing Morrisey's failure-to-accommodate claim begins with the elements of the direct evidence test. To state a claim for failure to accommodate under the direct method, Morrisey must show first that she is disabled, and second that she is "otherwise qualified for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kleiber*, 485 F.3d at 869 (citation and internal quotation marks omitted). Because all of Morrisey's claims require her to establish that she is disabled, we begin with the law governing disability.

The ADA defines a disability as: "a physical or mental impairment that substantially limits one or more major life activities . . . a record of such an impairment . . . or being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending . . . , and working." § 12102(2)(A). Under the 2008 amendments to the ADA, Congress made clear that the definitions of both a "disabled person" and "substantially limits" are to "be construed broadly in favor of expansive coverage." § 12102(4)(A), (B); *see also* 29 CFR § 1630.2(j)(1)(i).

"To determine whether a disability substantially limits major life activities, the regulations direct courts to compare the person claiming a disability to 'most people in the general population.'" *Hostettler*, 895 F.3d at 854 (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). This is not a demanding standard, 29 C.F.R. § 1630 (Appendix), and in general, a plaintiff does not need to submit scientific, medical, or statistical proof to establish a substantial limitation, § 1630.2(j)(v). Additionally, "'[a]n impairment need not prevent, or significantly or severely restrict . . . a major life activity' to be substantially limiting." *Id.* at 853-54 (quoting § 1630.2(j)(1)(ii)).

Pertinently, Congress removed the following language from the ADA in the 2008 Amendments:

> With respect to the major life activity of working –
>
> (i) the term *substantially limits* means significantly restricted in the ability *to perform either a class of jobs or a broad range of jobs* in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i) (2010) (emphasis added). Congress omitted this provision because it intended for courts to analyze whether a plaintiff can perform certain jobs only when a plaintiff claims she is substantially limited from *working*—but not for other major life activities. *See* §1630 (Appendix) ("The Commission has removed from the text of the regulations a discussion of the major life activity of working. This is consistent with the fact that no other major life activity receives special attention in the regulation, and with the fact that, in light of the expanded definition

of disability established by the Amendments Act, this major life activity will be used in only very targeted situations.").

Coldwater argues that pre-2008 cases are still good law in regard to determining whether a plaintiff was disabled. They are not. The 2008 Amendments were enacted to respond to "years of court decisions narrowly defining who qualifies as an individual with disabilities[,] [which] left the ADA too compromised to achieve its purpose." *Hostettler*, 895 F.3d at 848. Therefore, as we held in *Hostettler*, the 2008 Amendments "invalidate those decisions . . . to 'restore the intent and protections of the Americans with Disabilities Act.'" *Id.* at 849 (quoting Pub. L. No. 110-325, 122 Stat. 3553).

Morrissey asserts that she is disabled under all three definitions of disability. *See* § 12102(1)(A)-(C). The district court found otherwise, but it viewed this case through the wrong lens and relied on outdated authority. It held that Morrissey had not established that she was substantially limited in performing any major life activities because (1) there was a dearth of medical evidence in the record that confirmed Morrissey's purported diagnoses, (2) she never told Coldwater about her specific diagnoses, and (3) a restriction on work hours alone is insufficient to establish the existence of a disability.

That determination did not address many of Morrissey's factual arguments or the 2008 Amendments to the ADA. From her complaint onward, Morrissey asserted that she was disabled because she was substantially limited in her ability to walk, stand, bend, and lift repetitively due to Scoliosis, bulging disc, Ehlers-Danlos syndrome, and Buschkes-Ollendorf syndrome. 29 C.F.R. § 1630.2(j)(1)(ii). She never argued that she was disabled because of an inability to work, which is not necessary to her claim—as Congress made clear when it omitted the substantial-limitation-on-working provision noted above. Moreover, she did not *have* to tell Coldwater about her specific diagnoses. Morrissey told Coldwater that she could not work more than twelve-hours per shift because she suffered from a disability as defined by the ADA. That was enough. *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) ("An employer has notice of the employee's disability when the employee tells the employer that he is disabled.") (citation omitted)); *see also Cady v. Remington Arms Co.*, 665 F. App'x 413, 418 (6th Cir. 2016) ("[T]he employee need not use the word 'disabled,' but the employer must know enough information about

the employee's condition to conclude that he is disabled. Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." (internal citation omitted)). Finally, as Coldwater tacitly concedes, Morrissey's medical records establish that she suffered from disc disease. Thus, the district court erred on the grounds it used to support its holding.

Framed correctly, the question before us is whether Morrissey submitted enough evidence to show that she is substantially limited in her ability to walk, stand, lift, or bend. In her deposition, Morrissey testified that she did not have a specific limitation on the distance she could walk, the amount of time she could stand, the amount of bending she could do, or the amount of weight she could lift. Instead, she averred that, after an eight to twelve-hour shift, she had difficulty walking, standing, lifting, and bending. She testified that she was in pain constantly, and her nursing shifts exacerbated the pain. Specifically, she said that she had severe pain in her buttocks and right leg and numbness and tingling in her feet after a shift. *See* 28 C.F.R. Pt. 35, App. C ("[A]n individual whose impairment causes pain or fatigue that most people would not experience when performing that major life activity may be substantially limited."). Additionally, she testified that she had so much trouble bending over that it was difficult to put on her underwear. Morrissey's daughter submitted an affidavit in which she stated that Morrissey did not walk at all or walked with a slight hunch and a pained expression after completing a day of work.[6] Morrissey's daughter also stated that Morrissey did not complete household chores that required lifting, bending, or stooping after working. Given that the term "substantially limits" is to "be construed broadly in favor of expansive coverage," Morrissey has satisfied her burden of showing that she is disabled.[7]

---

[6]Coldwater argues that Morrissey's daughter's affidavit pertains only to Morrissey's conditions in 2018, the year the affidavit was signed. However, in viewing the evidence in the light most favorable to Morrissey, the affidavit can be read as referencing the relevant time period.

[7]The district court also found that Morrissey could not show that she was regarded as disabled and purported to find that she did not have a record of a disability. First, there are material factual issues in dispute as to whether Coldwater regarded Morrissey as disabled. 42 U.S.C. § 12101(3) ("[A]n individual is 'regarded as [disabled]' if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity."). Morrissey repeatedly told Coldwater that she was under a work restriction due to a disability, and there is evidence that Coldwater constructively discharged Morrissey due to her disability, as is discussed *infra*. While neither of these facts are conclusively established by the record, that is precisely why the claim must proceed to trial. Second, the district court provided no analysis to underpin its holding that Morrissey did not have a record of a disability, and on appeal,

The district court also found that the record did not support Morrissey's assertion that Coldwater did not accommodate her.  Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless such [employer] can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A).  A reasonable accommodation includes "job restructuring, part-time or modified work schedules, reassignment to a vacant position . . ., and other similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(9)(B).

The court opined that "Plaintiff's evidence from over the course of four years reveals one, isolated 13.5 hour shift and eight de minimis overages."  **(Op. & Order, R. 136, PageID 1284.)**  According to the court, these "[d]e minimus employment actions are not actionable under the ADA."  **(*Id.*)**  However, this interpretation of the record ignored pertinent context and did not evaluate the facts that elucidated the material factual issues in dispute, which, under controlling precedent, reveal that Coldwater was not entitled to summary judgment.  *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099 (6th Cir. 2008).

To begin, Morrissey testified that Coldwater had a policy whereby it did not accommodate any employee's medical restrictions unless the injury was job-related.  Next, prior to Coldwater transitioning its nursing staff to twelve-hour shifts in late 2015, Morrissey asserts that she requested to be moved to a unit that required nurses to work only eight-hour shifts and that she requested to be moved to casual status, which would have prevented her from being mandated to work in excess of twelve-hours.  According to Morrissey, Coldwater denied both requests.  Additionally, after the transition to twelve-hour shifts, Morrissey averred that she was on a list of rotating nurses who were sporadically mandated to work beyond twelve hours, as evidenced by Morrissey's mandated 13.5-hour shift on January 31, 2016.  Finally, Morrissey testified that she was mandated to work for 16 hours on February 4, 2016, but she left work in the middle of her

---

Coldwater's entire argument consists of one short paragraph with no analysis.  Either of these are grounds for reversal. On the merits, though, Morrissey's personnel file had medical notes supporting her restriction; she repeatedly told Coldwater that she was under a restriction; and for a time, Coldwater honored the restriction.  *See* 29 C.F.R. § 1630.2(k)(1) ("An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.").  Therefore, this claim must also progress.

shift to avoid the mandatory overage.  Morrissey also states that she was improperly required to work 16 hours, rather than the nurse who was to take the next overage.

Viewing the evidence in the light most favorable to Morrissey, it shows that: (1) Coldwater had a blanket policy of denying accommodations for all non-work related disabilities, (2) Coldwater knew that Morrissey was under a twelve-hour work restriction, (3) Morrissey requested an accommodation, (4) Coldwater forced her to work beyond that restriction on January 31, 2016, and (5) Coldwater attempted to do so again five days later.  On these facts, Morrissey's overages from 2012-2015 are inconsequential.  But, Coldwater' argument improperly ignores the fact that it forced Morrissey, a disabled employee, to stay and work in excess of her physician-instituted medical restriction—and attempted to do so again five days later.  The record shows that Morrissey asked Coldwater for an accommodation due to her disability, and Coldwater did not accommodate her.  She was not required to establish anything more for her claim to ripen.[8]  *See Talley*, 542 F.3d at 1103-04, 1109 (holding that the defendant failed to accommodate an employee based on the employer's refusal to allow her to use a stool on the same day she requested to use the stool, and the employee left during the shift).  This satisfies Morrisey's burden under the direct evidence test applicable to a claim of failure to accommodate.  *Kleiber*, 485 F.3d at 868-69.

Coldwater thereafter makes no argument that summary judgment was warranted because the "proposed accommodation [would] impose an undue hardship upon the employer." *Monette*, 90 F.3d at 1186.  We, therefore, do not address this issue, and Morrisey's failure to accommodate claim may proceed to trial.

---

[8]We must pause here to address one more error made by the district court.  It held that, because Morrissey's allegations did not rise above "de minimis employment actions," she was not entitled to relief on her claim for failure to accommodate.  First**,** however, the de minimis standard arises in the context of an adverse employment action, not a failure to accommodate.  *Compare Arndt*, 716 F. App'x at 527 *with Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).  Second, and more importantly, under the district court's logic, an employer would be free to contravene a disabled employee's restrictions a certain number of times or with an unspecified amount of regularity before the employer is liable.  Such a rule would be not only cruel, but it would also contravene our previous precedent and the ADA.  *See Talley*, 542 F.3d at 1109 (holding that the plaintiff had a viable claim for discrimination when the plaintiff quit almost immediately after her employer denied her physician-supported request for an accommodation).

**B.      Constructive Discharge**

The district court also granted summary judgment to Coldwater on Morrisey's constructive discharge discrimination claim because it found that Morrisey was not disabled and had not been constructively discharged.  For the reasons described above, a dispute of material fact remains over whether Morrisey is disabled.  This claim is properly analyzed under the direct evidence test because Morrisey's constructive discharge was premised on Coldwater's failure to accommodate her.  *Kleiber*, 485 F.3d at 868 (claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence).**[9]**

"To demonstrate a constructive discharge, [a] [p]laintiff must adduce evidence to show that 1) 'the employer . . . deliberately created intolerable working conditions, as perceived by a reasonable person,' and 2) the employer did so 'with the intention of forcing the employee to quit . . . .'"  *Logan v. Denny's*, 259 F.3d 558, 568-69 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)).  "It requires a finding that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"  *Talley*, 542 F.3d at 1107 (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).

The district court found there was no constructive discharge for largely the same reasons it found Coldwater had not failed to accommodate Morrissey—because her evidence was not enough.  We disagree.

In *Talley*, we stated that "a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge.'"  542 F.3d at 1109 (quoting *Johnson v. Shalala*, 991 F.2d 126, 132 (4th Cir. 1993)).  This case presents precisely that scenario.  Morrissey informed Coldwater numerous times of her twelve-hour restriction from 2012-2016, but Coldwater mandated Morrissey to work 13.5 hours

---

**[9]**A constructive discharge claim may sometimes be properly analyzed under the indirect test when the claim is not premised on a failure to accommodate but instead on another form of disability discrimination (*i.e.*, a claim more akin to a traditional Title VII discrimination claim).  *See Kleiber*, 485 F.3d at 868 n. 2 (noting that for "claims premised upon an adverse employment decision such as a failure to hire, failure to promote, or discharge," the indirect-evidence test may be appropriate).

on January 31, 2016. When Morrissey told her manager that she had a disability that prevented her from working beyond twelve-hours, the manager told Morrissey that she had "no control" over the situation. Five days later, Morrissey was informed that she was being mandated to work sixteen hours, even after Morrissey, again, told her supervisor that she was under a medical restriction. When she complained to Hayes, Hayes stated there was nothing she could do. In the face of Coldwater's repeated failures to honor Morrissey's accommodation requests, a reasonable plaintiff in her position would have felt compelled to resign. Because Morrissey has shown that a reasonable juror could have found that she was constructively discharged, she has satisfied the adverse employment element. Her claim for disability discrimination proceeds to trial.[10]

We also note that Coldwater cannot escape liability by arguing that its blanket policy of denying accommodations for all non-work-related disabilities is ostensibly neutral. If a school "lacked an elevator to accommodate a teacher with mobility problems[,]" it "could not refuse to assign him to classrooms on the first floor, then turn around and fire him for" the so-called neutral policy of "being late to class after he took too long to climb the stairs between periods." *Dolgencorp*, 899 F.3d at 435. Put another way, even though a requirement that a teacher be in the classroom when the bell rings is a neutral attendance requirement, a tardy teacher is not unqualified if his tardiness results from his employer's unwillingness to provide a reasonable accommodation. So too here. Coldwater cannot refuse to provide Morrisey with a reasonable accommodation and then conclude that she is not qualified for her position because she cannot meet her job's requirements without an accommodation.

As already discussed, Coldwater does not argue that summary judgment was appropriate because the "proposed accommodation [would] impose an undue hardship upon it." *Monette*, 90 F.3d at 1186. Thus, Morrisey's constructive discharge claim may proceed to trial.

## C. Retaliation

Morrisey's last claim is that Coldwater retaliated against her for exercising her rights under the ADA. This claim is properly analyzed under the indirect evidence test, which follows the

---

[10]Coldwater submits no argument that its actions were legitimate and nondiscriminatory. Therefore, we do not address that issue.

*McDonnell Douglas* burden shifting approach. To establish a prima facie case of retaliation, a plaintiff must show that "(1) [she] engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)).

The district court granted summary judgment to Coldwater after finding that Morrissey had not suffered an adverse employment action. But we have long recognized that a constructive discharge qualifies as an adverse employment action., *e.g., Arndt v. Ford Motor Co.*, 716 F. App'x 519, 529 (6th Cir. 2017), and for the reasons described above, the record supports a finding that Morrisey was constructively discharged. As for the remaining elements, Morrissey requested, repeatedly, that Coldwater accommodate her twelve-hour work restriction, which, assuming that the restriction was still in effect, constituted protected activity. *A.C. ex rel. J.C.*, 711 F.3d at 698. Next, considering that Morrissey asked management and administration at Coldwater to be accommodated, Coldwater was aware of the activity. Finally, viewing the record in Morrissey's favor, it could be interpreted to show that, because of her alleged work restriction, Coldwater targeted Morrissey to be mandated to work more than twelve-hours on February 4, 2016, leading to the constructive discharge. Morrissey and Marci Farmer both stated that it was Farmer's turn to be mandated that day, but for some reason, Morrisey was. Coldwater does not provide an explanation for this beyond asserting that there is no evidence from a manager as to exactly how the mandatory overtime process worked, but Morrissey herself testified that there was a rotating system in place. Therefore, this is a disputed fact. Given that Coldwater has offered no legitimate, undisputed evidence explaining why Morrissey was mandated ahead of Farmer on February 4, 2016, a dispute of material fact exists. It was not appropriate to grant summary judgment on the causal-connection element.

**III.**

Based on the foregoing, we **REVERSE** the district court's grant of summary judgment to Coldwater on all of Morrissey's claims and remand the case for further proceedings consistent with this opinion.